# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| BRYAN COLSON, | ) | |
| | ) | No. 13 CV 3018 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| CAROLYN COLVIN, Acting | ) | |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | August 14, 2015 |
| Defendant. | ) | |

## MEMORANDUM OPINION and ORDER

Bryan Colson claims that he is entitled to Supplemental Security Income ("SSI") because he is disabled by a combination of back and other bodily pain, hypertension, borderline intellectual functioning, and depression. After the Appeals Council declined to review the Administrative Law Judge's ("ALJ") decision denying him benefits, Colson filed this suit seeking judicial review. See 42 U.S.C. § 405(g). Before the court are the parties' cross-motions for summary judgment. For the following reasons, Colson's motion for summary judgment is granted and the government's motion is denied:

## Procedural History

Colson applied for SSI on June 21, 2010, claiming that he became disabled on January 1, 2007. (Administrative Record ("A.R.") 123-26.) Colson's claim was denied initially and on reconsideration. (Id. at 69-70, 83-85.) Thereafter, Colson requested and was granted a hearing before an ALJ, which took place on October

28, 2011. (Id. at 38, 87-88, 90-98.) On December 16, 2011, the ALJ issued a decision concluding that Colson is not entitled to SSI. (Id. at 24-33.) The Appeals Council declined review on February 15, 2013, (id. at 1-5), thereby rendering the ALJ's decision as the final decision of the Commissioner of Social Security Administration, s*ee Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). Colson then filed this action seeking judicial review of the Commissioner's decision. *See* 42 U.S.C. § 405(g). The parties consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); (R. 7).

## Facts

Colson alleges that he has been unable to work since January 2007 as a result of back pain, hypertension, and other ailments. (A.R. 123-26, 141-47.) Colson was 48 years old at the time of his alleged disability onset date. (Id. at 123.) He became homeless in 2007 and has been impoverished since that time. (Id. at 232-35.) Colson is a high school graduate, but he had to repeat several grades and has a full-scale IQ of 76. (Id. at 61, 232, 241.) At his hearing before an ALJ, Colson supplied documentary and testimonial evidence in support of his claim.

## A. Medical Records

Colson's medical records show that he has suffered from a number of physical ailments, including back, shoulder, and wrist pain and hypertension. With respect to his back pain, Colson sustained a back injury in 1994 while lifting heavy boxes at Cook County Hospital, where he worked in the shipping and receiving department from 1981 to 1996. (A.R. 57, 237, 296.) Colson underwent physical therapy and

lumbar surgery in 1994. (Id. at 296.) After his back surgery, Colson continued to experience "severe and persistent" back pain. (Id. at 232.) He returned to work but transitioned to a more sedentary position and worked as a pill counter at the pharmacy. (Id. at 238.) This new position required him to sit for the duration of his eight-hour shift, which "exacerbated his back pain." (Id.) As a result, Colson quit and subsequently was unable to maintain steady employment. (Id.) For example, in 2000, Colson worked briefly at a dollar store but was fired after injuring his back while emptying trash. (Id. at 58, 238.) Colson said he "felt something snap" and was taken by ambulance to the emergency room. (Id. at 238.) In recent medical records, Colson was diagnosed with sciatica and nerve damage in his lower back. (See id. at 331.) Colson has complained of back pain that radiates down from his back to his legs, particularly when he walks more than two or three blocks, climbs stairs, or sits for extended periods. (Id. at 232-33.)

Colson also has pain in his left shoulder and wrist, which he claims precludes him from carrying anything in his left hand. (Id. at 233.) Colson has described the shoulder pain as a "'terrible,' cramping pain." (Id.) Furthermore, Colson has suffered from hypertension since 1983. (Id. at 296.) Colson has been hospitalized twice for hypertension, including most recently in 2009. (Id.) Colson has been prescribed a number of medications for his hypertension, (see, e.g., id. at 207, 221, 268, 307), although he has not taken them consistently because of his indigency, (id. at 56, 268).

Colson did not supply any medical records pre-dating 2009. Medical records from 2009 to 2010 show that Colson sought treatment for, and has a history of, back and other bodily pain and hypertension. For example, in May 2009, Colson was treated at West Suburban Medical Center ("WSMC") for cardiac issues, headache, dizziness, and blurred vision.[1] (Id. at 206-11.) The treating physicians ordered a number of tests, including an EKG and head and chest CT scans. (Id. at 211-19.) Those tests showed the following: "[s]light hyperinflation" of Colson's heart, (id. at 216); no evidence of "acute infarct, intracranial hemorrhage or mass lesion" in Colson's head, (id. at 218); and a "small hypodense area bordering the occipital horn of the left lateral ventricle," (id.). Colson also visited WSMC on December 20, 2010, after he fell and injured his back, left hip, shoulder, and neck. (Id. at 346.) The treating physician noted that Colson had a "strong gait" but was "hunch[ed] o[]ver a littl[e]." (Id.)

Additionally, Colson saw Dr. Thomas Staff of PCC Austin Family Health Center in October and November 2010. (Id. at 304-11, 323-27.) Colson complained of left shoulder pain, lower back pain, headaches, left arm and leg weakness, hypertension, cardiac issues, and a ganglion cyst in his left wrist. (Id. at 304, 305,

---

[1] Handwritten medical records, which are difficult to decipher, appear to state that Colson "last used heroin yesterday" [in May 2009] and that he has a history of heroin usage. (A.R. 209; see also id. at 211.) Medical records from Colson's October 14, 2010 visit with Dr. Thomas Staff note "previous drug use." (Id. at 305.) Colson has denied drug usage, (id. at 236), and Dr. Staff stated in his residual functional capacity questionnaire that Colson's symptoms and limitations were not related to ongoing drug or alcohol abuse, (id. at 330; see also id. at 297). Neither party refers to Colson's drug use or argues that a different standard applies if he has a history of drug use.

307, 311, 325, 326.) During those visits, Dr. Staff noted that Colson needed to be evaluated for a possible stroke, (id. at 307, 326), and that Colson had a "limp" gait and station, (id. at 306, 310, 325). As a result, in October 2010 Colson underwent scans of his chest and head. (Id. at 276-77.) The chest image showed "[n]o evidence of any acute cardiopulmonary process." (Id. at 276.) The head scan showed "no evidence of acute infarct, intracranial hemorrhage or mass lesion." (Id. at 277.) But there was "very slight hypodensity in the periventricular white matter" and "a minute lacune at the basal ganglia on the right." (Id.)

Colson visited Dr. David Freedman of the University of Illinois Medical Center at Chicago on July 9 and July 30, 2010. (Id. at 268-72.) Dr. Freedman's July 9, 2010 progress notes are faint and largely illegible, but it is clear that Colson visited Dr. Freedman on July 9th and complained of back pain, explained his medications, and related his social history. (Id. at 270-72.) Dr. Freedman diagnosed Colson with hypertension, left lower back pain, headaches, and "[l]eft shoulder pain which appears to be rotator cuff tendinitis." (Id. at 268-72.)

Drs. Staff and Freedman completed residual functional capacity ("RFC") questionnaires for Colson on November 19, 2010, and July 30, 2011,[2] respectively. (Id. at 328-35.) In the questionnaires, Colson's diagnoses are listed as: "(1) sciatica [on the left side of his] lower back L4-5 with nerve damage[,] (2) hypertension[, and]

---

[2] Although Dr. Freedman listed the date on his RFC questionnaire as July 30, 2011, the date likely was July 30, 2010. Colson had a second appointment with Dr. Freedman on July 30, 2010. (A.R. 268-69.) Furthermore, it appears from the face of the completed RFC questionnaire as though the document was faxed to the Legal Assistance Foundation on August 17, 2010. (Id. at 331-35.)

(3) rotator cuff tendinitis [on the left] shoulder," (id. at 331; see also 328), as well as "weakness on [left] side [with history of] lacunar infarct/CVA," (id. at 328). Dr. Freedman also noted the following limitations: Colson had decreased range of motion along with weakness and decreased sensation in his left leg; left leg pain; left shoulder pain; and decreased range of motion in his left shoulder. (Id. at 331.) Straight-leg testing showed decreased strength, and knee flexor extensions showed decreased sensation in the left lateral leg. (Id.) According to Drs. Staff and Freedman, Colson's general prognosis was "fair" to "poor." (Id. at 328, 331.) Based upon their examinations, they separately concluded that Colson was functionally limited in the following ways:

1. can walk one to two blocks without resting or experiencing severe pain;

2. can sit for 30 to 45 minutes at one time;

3. can stand for 30 minutes at one time;

4. can sit and stand/walk for fewer than two hours in an eight-hour work day, (id. at 333; but see id. at 329 (stating that Colson can sit for at least six hours and stand/walk for about two hours in an eight-hour work day));

5. needs periods of walking around during an eight-hour work day;

6. needs a job that permits him to shift at will from sitting to standing to walking;

7. sometimes will need to take unscheduled breaks during an eight-hour shift;

8. occasionally to frequently can lift and carry items weighing under 10 pounds; rarely to occasionally can lift and carry items weighing 10 to 20 pounds; never to rarely can lift and carry

6

items weighing 20 pounds; and never can lift and carry items weighing 50 pounds;

9.     can never twist, stoop, crouch, or climb ladders and rarely can climb stairs; and

10.    likely to have "good days" and "bad days" and to be absent from work more than four days each month as a result of his impairments or treatment, (id. at 334; but see id. at 330 (stating that Colson is likely to be absent from work about one day per month)).

(Id. at 328-29, 332-34.)

Colson's records also reveal that he is mentally ill and has limited cognitive abilities, the effects of which may be magnified by his homelessness. Colson was diagnosed with borderline intellectual functioning. (Id. at 241, 243.) He has a full-scale IQ of 76, meaning that his intellectual ability is "poorer than 95% of his peers." (Id. at 241.) Colson is a high school graduate, but he repeated several grades due to a "failure to make adequate academic progress." (Id. at 61, 232.)

Additionally, Colson suffers from depression. (Id. at 234-39, 242-43.) After several years of unemployment, Colson and his wife separated in 2007, resulting in Colson becoming homeless. (Id. at 234.) Colson became "deeply discouraged" as a result of his homelessness, which lasted until 2010, when a friend allowed Colson to live in the basement of a vacant building—which Colson described as "a big house" with separate, locked entries to "two floors and [a] basement"—without paying rent. (Id. at 44-45, 232, 235.) Colson reported feelings of fear, apprehension, depression, dysphoria, hopelessness, futility, and failure. (Id. at 235-37.) Furthermore, Colson

has difficulty sleeping, is irritable, has difficulty concentrating and sustaining attention, and has become isolated and withdrawn. (Id. at 236, 239, 243.)

After a psychological evaluation of Colson, Nicolette Puntini, Ph.D., diagnosed him with major depressive disorder ("MDD"). (Id. at 243.) Dr. Puntini administered the Beck Depression Test to Colson. (Id. at 242.) Colson scored 24 on the test, suggesting "moderate depressive symptomatology." (Id.) But Dr. Puntini found that the Beck score was "an underestimate of the severity of [Colson's] current depressive symptoms," based upon a number of statements endorsed by Colson, such as: "I am so sad or unhappy that I can't stand it"; "I feel more discouraged about my future than I used to be"; "[a]s I look back, I see a lot of failures"; "I don't enjoy things as much as I used to"; "I feel guilty over many things I have done or should have done"; "I am disappointed in myself"; and "I feel like crying, but I can't." (Id.) Based upon her evaluation, Dr. Puntini assigned Colson a Global Assessment of Functioning ("GAF") score of 50, indicating "severe symptoms." (Id. at 243; R. 22, Pl.'s Mot. at 4.) Dr. Puntini concluded that Colson "would have difficulty maintaining concentration, persistence, and pace in a competitive work setting" and that "[h]is irritability and interpersonal alienation would interfere with his ability to maintain occupational relationships . . . ." (A.R. 243.) Furthermore, Dr. Puntini completed a Mental RFC assessment showing that Colson had "marked" difficulties in: maintaining concentration, persistence, and pace; carrying out detailed instructions; and maintaining attention and

concentration for extended periods. (Id. at 259.) Dr. Puntini determined that Colson met the listing for 12.04, Affective Disorders. (Id. at 245.)

**B.      Opinions of State Consulting Physicians**

Colson's records include reviews by a state-consulting psychologist and a physician. Donna Hudspeth, Psy.D., reviewed Colson's records and determined that Colson satisfied the listing for 12.04, Affective Disorder, as evidenced by his MDD. (A.R. 285.) She also found that Colson satisfied the listing for 12.02, Organic Mental Disorder, as evidenced by his Borderline Intellectual Functioning. (Id. at 283.) As a result, Dr. Hudspeth concluded that Colson had "moderate" difficulties in maintaining concentration, persistence, or pace and one or two episodes of decompensation. (Id. at 292.)

Dr. Liana Palacci saw Colson for an Internal Medicine Consultative Examination at the request of the Bureau of Disability Determination Services. (Id. at 296-300.) Dr. Palacci found that Colson had normal musculoskeletal characteristics, normal neurological functioning, and normal mental health. (Id. at 298.) She did not have any medical records for Colson. (Id. at 296.)

**C.      Colson's Hearing Testimony**

At his hearing before the ALJ, Colson testified that he lost "[e]verything" after injuring his back. (A.R. 58.) Colson said that sitting for an extended period of time causes "a lot of pain on [his] back." (Id.) Colson can walk "maybe one, maybe two" blocks and then experiences pain. (Id. at 55.) He cannot carry anything

heavier than a broom.  (Id.)  He experiences a "lot of pain [on his left side], all the way from the shoulder down to [his] feet."  (Id. at 60.)

Colson also testified about his current living situation and daily activities.  A friend lets him live in the basement of a vacant building without paying rent.  (Id. at 44-45.)  Colson picks up trash around the building.  (Id. at 46.)  He also sweeps the stairs periodically.  (Id.)  He has shoveled light snow on a few occasions near the back door.  (Id. at 46-47.)  A neighbor accompanies Colson to the grocery store and carries home the groceries for him.  (Id. at 54-55.)  Colson said that "over the course of maybe a couple of years now, maybe longer, I don't know what happened, but everything slowed down, real slowed down."  (Id. at 59.)  He has not taken his medications consistently.  (Id. at 60-61.)  He has "[n]o money," except for a Link card containing $200 per month.  (Id. at 44, 48, 53.)  He has never been treated by a psychiatrist.  (Id. at 56.)

## D. Vocational Expert's Hearing Testimony

The ALJ called a vocational expert ("VE") to testify regarding the types of jobs a person with certain hypothetical limitations could perform.  The ALJ first asked the VE to assume that the hypothetical person is nearing advanced age with a high school education and no past relevant work, "can lift and carry 20 pounds occasionally and 10 pounds frequently; and can be on his feet, standing or walking about four hours in an eight-hour workday, and sit . . . about six hours with normal rest periods."  (A.R. 62.)  The hypothetical person also is "unable to work at heights, climb ladders, or frequently negotiate stairs and may only occasionally crouch,

kneel, or crawl . . . [and is] unable to understand, remember, or carry out complex job tasks." (Id.) The VE initially testified that such an individual is capable of "sedentary" work under the regulations. (Id.) The VE then asked the ALJ whether the "sedentary" conclusion was "correct," and the ALJ responded, "Well, I don't know." (Id.) The VE then stated that "technically, this hypothetical is probably sedentary," but he went on to find "light[,] unskilled jobs that [such] a person could do either sitting or standing," such as working as an inspector, hand packager, or assembler. (Id. at 62-63.) According to the VE, however, the hypothetical person could not remain in such a job if he were off task more than 10 to 12 percent of the time and had two or more unexcused absences per month. (Id. at 63-64.) The ALJ also presented an alternative hypothetical to the VE, which was based upon Dr. Staff's RFC. (Id. at 64; see also id. at 328-30.) When considering Dr. Staff's limitations, the VE found that the hypothetical person would not be able to work in the jobs previously identified. (Id. at 65.)

Colson's attorney presented an additional hypothetical to the VE, based upon Dr. Puntini's and Dr. Staff's findings, which assumed that Colson also has "been determined to have [MDD] and organic mental disorder," a "history of lacunar infarct," and "marked limitations in social functioning, concentration, persistence, and pace." (Id. at 65; see also id. at 259, 328.) Under such circumstances, the VE testified that Colson "cannot do any of the jobs I've testified to or any I could testify to." (Id. at 65.)

## E.    The ALJ's Decision

The ALJ evaluated Colson's claim under the required five-step analysis.  *See* 20 C.F.R. § 416.920.  The ALJ concluded that:  (1) Colson had not engaged in substantial gainful activity since June 16, 2010, the application date; (2) Colson's low intellectual functioning, arthralgias, and hypertension are severe impairments; (3) these impairments do not meet or equal a listed impairment; (4) Colson has the RFC to perform work consistent with the first hypothetical that he presented to the VE; and (5) based on this RFC, Colson can perform jobs that exist in significant numbers in the national economy.  (A.R. 26-33.)

The ALJ found that Colson's testimony regarding the "intensity, persistence and limiting effects" of his ailments was neither credible nor supported by the objective medical evidence.  (Id. at 29.)  The ALJ noted that Colson had not sought regular medical care, been treated by a psychiatrist, or taken his medications consistently.  (Id. at 28-30.)  The ALJ discounted Drs. Staff's and Freedman's findings on the grounds that their opinions were "extreme," sought for the purpose of filling out disability paperwork, and "not supported by the objective medical evidence."  (Id. at 29-30.)[3]  Similarly, the ALJ discounted Dr. Puntini's opinions because they were attorney-generated and not supported by a "longitudinal record" of documented mental health issues.  (Id. at 31.)  And the ALJ only gave

---

[3]  The ALJ also found incredible Dr. Staff's statement that he had been treating Colson for "several visits per year" since September 17, 2001, and Dr. Freedman's statement that he had been treating Colson since July 9, 2010, because no "records exist" for such visits.  (A.R. 29; but see id. at 225 (WSMC record from Apr. 16, 2009, listing Dr. Staff as Colson's "personal physician"), 268-72 (Dr. Freedman's July 9 and July 30, 2010 Clinic Progress Notes for Colson).)

Dr. Hudspeth's opinion "some weight" because she was a non-examining medical source. (Id.) The ALJ agreed with Dr. Palacci's medical findings, which showed that Colson had a normal gait, normal strength in his hands, normal range of motion, normal straight-leg testing, and normal attire, affect, and overall effort and cooperation. (Id. at 30.)

## Analysis

Colson challenges several aspects of the ALJ's decision. First, Colson argues that his depression and back pain qualify as severe impairments. Colson next claims that the ALJ failed to make a proper RFC determination because he failed to consider all of Colson's limitations. Finally, Colson asserts that the ALJ improperly discounted medical opinions of record.

This court reviews the ALJ's decision only to ensure that it is based on the correct legal criteria and supported by substantial evidence. *See Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The ALJ is required to "build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014). But the court is "not free to replace the ALJ's estimate of the medical evidence" with its own, *see Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), and must uphold the decision even where "reasonable minds can differ over whether the applicant is disabled," *see Shideler v. Astrue*, 688

F.3d 306, 310 (7th Cir. 2012). However, where the Commissioner commits an error of law, and the error is not harmless, the court must reverse the decision regardless of the evidence supporting the factual findings. *See Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

## A. The ALJ's Step-Two Findings

Colson argues that the ALJ erred by finding that his depression and back pain were not "severe." (R. 22, Pl.'s Mot. at 7-10.) Under 20 C.F.R. § 416.920(c), "severe" means a significant limitation that interferes with a claimant's ability to work. Courts have construed "severe" to mean only more than "slight." *See, e.g.*, *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992). Thus, a "disability claimant can be considered as not suffering from a severe impairment only if the impairment is a slight abnormality having only a minimal effect on a person's ability to perform the full range of work-related activities." *Chapman v. Barnhart*, 189 F. Supp. 2d 795, 804 (N.D. Ill. 2002). In determining the level of severity, courts have considered whether the claimant received a "definite diagnosis," whether treatment was recommended, and whether medication remedied or controlled the impairment. *Anthony*, 954 F.2d at 295; *see also Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988).

Here, substantial evidence does not support the ALJ's finding that Colson's depression was not severe. Colson received a "definite diagnosis" of MDD from Drs. Puntini and Hudspeth. *See Anthony*, 954 F.2d at 295; (A.R. 243, 285). Moreover, Puntini assigned Colson a GAF score of 50, indicating a serious

impairment. (Id. at 243; R. 22, Pl.'s Mot. at 4.) Dr. Staff also recommended treatment for Colson's depression, "using antidepressant, psychotherapy and/or a combination of treatment." (A.R. 324.) While there is no record of Colson taking antidepressant medications or undergoing psychotherapy, the ALJ did not explore why Colson had not sought such treatment. (A.R. 60-61, 326.) Accordingly, the ALJ could not "draw any inferences about [Colson's] condition . . . [without having] explored [Colson's] explanations as to the lack of medical care." *See Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (citation omitted) (reasoning that "mental illness in general . . . may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment").

Furthermore, because Colson is alleging a mental impairment, the ALJ was required to consider "paragraph B criteria" in determining severity. *See* 20 C.F.R. § 416.920a(a)(1). Paragraph B criteria are "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." *See* 20 C.F.R. § 420a(c)(3). Drs. Puntini and Hudspeth considered the paragraph B criteria and issued findings demonstrating the severity of Colson's MDD. For example, Dr. Puntini found that Colson's mental impairment would cause him to have: "marked" difficulties in "maintaining concentration, persistence, and pace in a competitive work setting" and carrying out detailed instructions; "moderate" restriction of activities of daily living; and that "[h]is irritability and interpersonal alienation would interfere with . . . relationships." (A.R. 243, 255, 259.) Dr. Hudspeth similarly found that Colson had "moderate" difficulties in

maintaining concentration, persistence, and pace and one or two episodes of decompensation. (Id. at 292.) Colson therefore submitted sufficient evidence showing that his MDD is more than a "slight" impairment. *See Anthony*, 954 F.2d at 293; (see A.R. 242-45, 259, 285, 292).

In contrast, substantial evidence supports the ALJ's finding that Colson's back pain was not severe. Although Dr. Freedman diagnosed Colson with sciatica and nerve damage in his lower back, Dr. Palacci disagreed. *See Anthony*, 954 F.2d at 295; (A.R. 184, 190, 331). Dr. Palacci found that Colson had a normal gait, strength, range of motion, and straight-leg testing. (A.R. 30.) Likewise, Dr. Staff reported minimal weakness on Colson's left side without other significant abnormalities. (Id. at 306, 310, 318, 321, 325-26.) In terms of treatment, Colson did not supply medical records pre-dating 2009 even though he said that he underwent lumbar surgery in the 1990s, (id. at 223, 238), and claimed that in 2000 he sustained a back injury, requiring an emergency room visit, (id. at 238). Based upon the medical records supplied, Colson reported back pain during his visits to the doctors in October, November, and December 2010. (Id. at 304, 316, 326, 346.) The treating physicians prescribed such over-the-counter medications as Ibuprofen and Motrin for Colson's back pain but not injections or physical therapy. (Id. at 158, 198, 268.) Although Drs. Staff and Freedman separately recommended functional limitations for Colson, (id. at 328, 332), Dr. Palacci did not, (id. at 296-300). Moreover, the ALJ considered Colson's testimony showing that Colson still was able to perform certain activities, such as taking public transportation and

picking up trash, sweeping, and shoveling light snow. (Id. at 27-28.) Therefore, the ALJ's finding as to Colson's back pain is supported by substantial evidence. *See Anthony*, 954 F.2d at 293.

In any event, the ALJ found that Colson cleared the "*de minimus*" step-two hurdle. As a result, the ALJ was required to consider the combined effects of Colson's severe and nonsevere impairments in the remaining steps of his analysis. *See Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008); *see also Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011) (finding that the ALJ erred in concluding that the claimant could perform her prior work because the ALJ did not consider the "interaction" between her "many physical and mental" impairments—even those that were less serious—because "the combination of them might well be totally disabling[,]" even if each impairment assessed separately were not). It therefore is "legally irrelevant" that the ALJ did not list depression or back pain as severe impairments at step two. *See Anthony*, 266 F. App'x at 457.

## B. The ALJ's RFC Assessment

Colson next argues that the ALJ did not consider all of the relevant evidence in formulating the RFC finding. More specifically, Colson asserts that the ALJ ignored important limitations with respect to Colson's depression and back pain, thereby failing to comply with SSR 96-8p. Policy Interpretation Ruling 96-8p provides that:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must

discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996).

Although an ALJ is not required to discuss every piece of evidence, he must consider all of the evidence that is relevant to the disability determination and provide enough analysis in his decision to permit meaningful judicial review. *See Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004); *Clifford v. Apfel*, 227 F.3d 863, 870-71 (7th Cir. 2000). The ALJ must also "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." *See* 20 C.F.R. § 416.923. The ALJ is required to undertake this analysis because the combination of a claimant's impairments "might well be totally disabling" even if each of the claimant's impairments standing alone is not serious. *Martinez*, 630 F.3d at 698.

Here, the ALJ committed reversible error in assessing Colson's RFC because he did not consider the full impact of Colson's impairments. For example, the ALJ does not explain how his RFC accounts for the mental health evidence showing that Colson suffers from MDD or organic mental disorder. Furthermore, the RFC does not address the limitations recommended by Dr. Puntini or Dr. Hudspeth. Dr. Puntini found that Colson had the following limitations: "marked" difficulties in "maintaining concentration, persistence, and pace in a competitive work setting"

and carrying out detailed instructions; "moderate" restriction of activities of daily living; and that "[h]is irritability and interpersonal alienation would interfere with . . . relationships." (A.R. 243, 245, 248, 255, 259.) Dr. Hudspeth agreed that Colson had borderline intellectual functioning and MDD, resulting in "moderate difficulties in maintaining concentration, persistence, or pace; and one or two episodes of decompensation." (Id. at 283, 285, 292.) Yet the ALJ's RFC accounted only for an inability "to understand, remember, [or] carry out complex job tasks." (A.R. 28.)

The Seventh Circuit has rejected as insufficient RFC findings that do not properly account for mental health impairments. In *Young*, the Seventh Circuit remanded an RFC assessment that restricted a claimant's work to "simple, routine, repetitive, low stress work with limited contact with coworkers and the public" because it did not adequately capture all of the claimant's "social and temperament problems," including difficulty with instructions and criticism, thinking independently, and goal setting. 362 F.3d at 1002-03. The court in *Young* found that the ALJ did not sufficiently "connect[] the dots" between the claimant's impairments, as supported by substantial evidence, and the RFC assessment. *Id*. at 1002. In *Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009), the Seventh Circuit pointed to a "clear line of precedent" finding that where a claimant presents documented limitations of concentration, persistence, or pace, the RFC—and hypothetical questions to a VE—must account for such limitations. *See also Craft*, 539 F.3d at 677-78; *Young*, 362 F.3d at 1004. It is not enough for an ALJ to restrict

a claimant's work to "simple" or "unskilled" tasks.   *Stewart*, 561 F.3d at 685.
Rather, the ALJ must specifically account for the limited ability to concentrate.   *Id*.

The Commissioner ignores *Stewart*, *Young*, *Craft*, and other precedent and
instead insists that the ALJ "assessed mental restrictions to accommodate" Colson's
"difficulty concentrating and remembering" by limiting Colson to "work that did not
involve detailed job tasks."  (R. 25, Gov't.'s Br. at 11.)  But, as pointed out, limiting
an RFC to an inability to "carry out complex job tasks" is insufficient to account for
limitations in concentration.  *See Stewart*, 561 F.3d at 685; *Young*, 362 F.3d at 1004;
*Craft*, 539 F.3d at 677-78.  Indeed, "[t]he ability to stick with a given task over a
sustained period is not the same as the ability to learn how to do tasks of a given
complexity."  *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010).

The ALJ in this action did not sufficiently "connect the dots" between
Colson's borderline intellectual functioning, MDD, and corresponding limitations as
delineated by Dr. Puntini and Dr. Hudspeth, and his RFC finding.  *See Young*, 362
F.3d at 1002.  By referring only to an inability "to understand, remember, or carry
out complex job tasks," the ALJ omitted significant limitations relating to the
following: Colson's concentration, persistence, and pace; restriction of activities of
daily living; social problems, including irritability and interpersonal alienation; and
episodes of decompensation.  (A.R. 243, 245, 248, 255, 259, 283, 285, 292.)

Given this faulty RFC assessment, the hypothetical questions that the ALJ
posed to the VE similarly lack "substantial justification" because they did not
address all of the relevant limitations.   *Stewart*, 561 F.3d at 685.   Where a

hypothetical is based upon an insufficient RFC, a court may find error in an ALJ's reliance upon a VE's testimony regarding the hypothetical, provided that the VE did not rely upon other documentary evidence. *See id.*; *Cass v. Shalala*, 8 F.3d 552, 556 (7th Cir. 1993). Here, the hypothetical questions directed to the VE did not include all relevant mental health limitations. (A.R. 62-64.) Only the third hypothetical—posed by Colson's attorney—specifically included, *inter alia*, limitations based upon an individual who has MDD and organic mental disorder, with marked limitations in social functioning, concentration, persistence, and pace. (Id. at 65.) The VE responded to the third hypothetical by testifying that there would not be any jobs that the hypothetical person could perform. (Id.) Thus, the ALJ's failure to include in the hypothetical limitations relating to mental health impairments constitutes reversible error.

Colson further argues that the ALJ failed to consider back pain and hypertension symptoms in formulating the RFC. But the ALJ's RFC adequately addressed such limitations. The ALJ did not adopt verbatim the restrictions recommended by Colson's treating physicians. (Id. at 28, 328, 332.) Nevertheless, the limitations that the ALJ included based upon back and other bodily pain and hypertension were more restrictive than those suggested by Dr. Palacci. (Compare id. at 28 with id. at 296-300.) Indeed, Dr. Palacci did not recommend any restrictions. (Id. at 296-300.) Therefore, substantial evidence supports the ALJ's RFC assessment with respect to Colson's work-related limitations based upon physical impairments. *See Cass*, 8 F.3d at 556.

## C.    Medical Opinions

Finally, Colson asserts that the ALJ did not give proper weight to the medical opinions of record.   (R. 22, Pl.'s Mot. at 15-18.)   An ALJ is entitled to resolve evidentiary conflicts "by giving more weight to some evidence and less to others." *Young*, 362 F.3d at 1001.   Yet an ALJ cannot dismiss medical evidence without substantial justification.  *See Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) ("An [ALJ] can reject an examining physician's opinion only for reasons supported by substantial evidence in the record."); *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985).   Furthermore, an ALJ "cannot substitute his expertise for that of a qualified physician, and, absent countervailing clinical evidence or a valid legal basis for doing so, cannot simply disregard the medical conclusions of a qualified physician." *Pancake v. Amax Coal Co.*, 858 F.2d 1250, 1255 (7th Cir. 1988).

Colson challenges as "troubling" the ALJ's finding that Dr. Puntini's opinions were not entitled to significant weight.   (R. 22, Pl.'s Mot. at 17.)   The ALJ gave reduced value to Dr. Puntini's opinions because her "examination [was] arranged by [Colson's] attorney," her findings were not supported by a "longitudinal record," and she "did not provide a function by function analysis."   (A.R. 31.)   As to the first and second reasons, the ALJ found persuasive the fact that Colson himself did not seek mental health treatment from Dr. Puntini or anyone else over a longstanding period.   (Id. at 31.)   During the hearing, however, the ALJ did not explore why Colson, who is homeless and impoverished, had not sought mental health care.   (Id. at 56.)   The ALJ's failure to do so is puzzling because he surmised in his ruling that

Colson's "lack of income could play some role in his lack of treatment," but then dropped the issue without any further discussion. (Id. at 31.) Having failed to make this inquiry, the ALJ could not then draw inferences against Colson on the basis of non-treatment. *See Craft*, 539 F.3d at 679. As to the third reason, the ALJ largely dismissed Dr. Puntini's mental RFC because she did not provide a function-by-function analysis. (Id.) But the question of what a claimant can do despite his limitations is exclusively within the ALJ's purview. *See* 20 C.F.R. § 416.927(d)(2) (noting that the final responsibility of crafting the RFC is reserved to the Commissioner); *Bates v. Colvin*, 736 F.3d 1093, 1102 n.4 (7th Cir. 2013) (noting that an opinion regarding what a claimant can or cannot do in a given day is not a "medical opinion" to which the ALJ must defer). Thus, an examining physician need not provide a function-by-function analysis. *Burnam v. Astrue*, No. 10 CV 5543, 2012 WL 710512, at *15 (N.D. Ill. Mar. 5, 2012); *see also* SSR 96-2p, 1996 WL 374188, at *1 (July 2, 1996). Dr. Puntini's failure to provide such an analysis therefore does not support the ALJ's decision to disregard her opinions.

Even though Dr. Puntini only evaluated Colson on one occasion, she administered six psychological tests during the evaluation and submitted a 14-page report detailing her findings, along with an additional mental health RFC assessment. (A.R. 231-62.) Dr. Hudspeth agreed with Dr. Puntini's diagnoses of borderline intellectual functioning and MDD. (Id. at 282, 285.) Moreover, Dr. Staff also opined that Colson suffered at least from mild depression. (Id. at 324.) Therefore, the ALJ erred by largely ignoring the evidence offered by Dr. Puntini,

especially without "countervailing clinical evidence or a valid legal basis for doing so." *See Pancake*, 858 F.2d at 1255.

The Commissioner claims that the ALJ relied upon countervailing evidence in granting Dr. Puntini's opinions little weight, (R. 25, Govt.'s Br. at 4-5), but such evidence did not amount to substantial evidence. Indeed, part of the alleged countervailing evidence came from Dr. Hudspeth, who generally agreed with Dr. Puntini's diagnoses, (id. at 283, 285), but then suggested *more restrictive* limitations, (see, e.g., id. at 292-94). Given that Dr. Hudspeth was "a non-examining medical source," however, her findings were entitled to less weight than those of Dr. Puntini, who did examine Colson. *See Gudgel*, 345 F.3d at 470 ("An [ALJ] can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice.").

The Commissioner also points approvingly to the ALJ's reliance on "physical medical records," which showed "normal mental status," (A.R. 31), even though there was no suggestion that Colson was ever screened or tested for depression or other mental health impairments during those medical visits. (See, e.g., id. at 306, 310, 318.) Although Dr. Palacci's report claims to include a section on Mental Status Examination, her findings relate to Colson's attire, affect, and overall effort and cooperation. (Id. at 298.) Dr. Palacci did not claim to have performed any diagnostic tests on Colson relating to mental health impairments. (Id.) On the one occasion when a medical doctor—Dr. Staff—screened Colson for depression, the

result was positive, showing the need for treatment. (Id. at 323-26.) While Dr. Staff diagnosed Colson only with "minor" depression, his diagnosis was based solely upon Colson's completion of a screening questionnaire. (Id. at 323-24.) And Colson's results still were significant enough to "[w]arrant[] treatment for depression, using antidepressant, psychotherapy and/or a combination of treatment." (Id. at 324.) The ALJ therefore "failed to build the 'accurate and logical bridge from the evidence to his conclusion'" that Dr. Puntini's opinions were not entitled to significant weight. *Young*, 362 F.3d at 1002 (quoting *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002)).

Notwithstanding these errors, the ALJ permissibly resolved evidentiary conflicts with the medical opinions of record pertaining to Colson's physical impairments. *See Young*, 362 F.3d at 1001. In particular, Colson claims that the ALJ erred in giving little weight to the treating medical source opinions of Drs. Freedman and Staff. (R. 22, Pl.'s Br. at 16-17.) Here, the ALJ had substantial justification for discounting both physicians' opinions. With respect to Dr. Freedman, the ALJ pointed out inconsistencies between Colson's medical records and Dr. Freedman's RFC assessment. (A.R. 29.) In his RFC opinion, for example, Dr. Freedman asserted that Colson could sit fewer than two hours and stand/walk fewer than two hours in an eight-hour workday. (Id., referring to evidence at 333.) Yet the ALJ noted that Colson had only received "conservative" treatment for his physical ailments. (Id.) The records show that Colson was prescribed medications such as Ibuprofen and Motrin for his back and other bodily

pain. (See, e.g., id. at 158, 198, 268.) Furthermore, in December 2010, Colson had normal range of motion and strength, no joint enlargement or tenderness of right upper extremity, and only "insignificant weakness" in the left upper extremity, according to Dr. Staff. (Id. at 29, referring to evidence at 318.) Dr. Staff's findings for the lower extremities were similar to the upper extremities. (Id.) Colson's medical records show other, normal medical findings, (see id. at 306, 310, 321), as does Dr. Palacci's evaluation from September 2010, (id. at 298). The ALJ was entitled to give more weight to the cited physical medical records and Dr. Palacci's findings than to Dr. Freedman's opinions for the reasons stated in the decision. *See Young*, 362 F.3d at 1001.

Finally, the ALJ also had sufficient justification for giving reduced weight to Dr. Staff's findings. Dr. Staff, for example, recommended in November 2010 a number of functional limitations for Colson based upon diagnoses of "hypertension, weakness on the left side, and history of lacunar infarcts/CVA." (A.R. 29, referring to evidence at 328.) Yet an October 2010 CT scan of Colson showed "no evidence of acute infarct, intracranial hemorrhage, or mass lesion" and "only a *minute* lacune at the basal ganglia on the right, and *suggestion* of the presence of other extremely minute ones bilaterally." (Id. at 29 (emphasis in original), referring to evidence at 337.) In short, the ALJ found that the medical evidence pertaining to Colson's physical condition was not consistent with Dr. Staff's RFC assessment. Additionally, the ALJ noted that Dr. Staff claimed to have been Colson's treating physician since 2001, (id. at 328), but Colson did not supply medical records from

Dr. Staff from before 2010, (id. at 29). Thus, substantial evidence supports the reasons that the ALJ provided for the weight accorded to different medical opinions pertaining to Colson's physical impairments.

## Conclusion

For the foregoing reasons, Colson's motion is granted, the Commissioner's motion is denied, and the case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

**ENTER:**

Young B. Kim
United States Magistrate Judge